JACOBUS F. FRANK v. UNITED STATES (No. 4780)[1]

United States Court of Customs and Patent Appeals, April 9, 1954

*Eugene R. Pickrell* for appellant.

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney, of counsel), for the United States.

[Oral argument February 2, 1954, by Dr. Pickrell and Mr. FitzGibbon]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON (retired), Associate Judges

JACKSON, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, pursuant to its decision C. D. 1514 sustaining in part a protest filed by appellant against the classification of certain imported merchandise designated on the invoice as Rubber Powder ("Mealorub").

The goods were imported from Indonesia to the port of New York and were classified by the Collector of Customs under the provisions of paragraph 1537 (b) of the Tariff Act of 1930 as "manufactures of India rubber" at 25 per cent ad valorem.

Appellant protested the correctness of the classification, claiming that the importation was properly free of duty as crude India rubber under paragraph 1697 of the Act or as a nonenumerated unmanu-

[1] C. A. D. 562

factured article under paragraph 1558 of the Act at 10 per cent ad valorem, or as a manufactured article under that paragraph at 20 per cent ad valorem.

The pertinent portions of the involved paragraphs read as follows:

Par. 1537. * * *

(b) Manufactures of india rubber or guttapercha, or of which these substances or either of them is the component material of chief value, not specifically provided for, 25 per centum ad valorem; * * *.

Par. 1697. India rubber * * * crude, * * * (free list).

Par. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

Five witnesses testified on behalf of appellant and two gave testimony for the Government. Several exhibits are in evidence.

It is disclosed in the record that the involved merchandise is produced by the tapping of rubber trees in the morning, the juice resulting therefrom being known as field latex. That substance is brought to a factory where it is bottled, screened, and placed into a receptacle called a reaction vessel. There is added to the latex while in the vessel ammonia, a dispersion of sulfur, zinc oxide, and an accelerator. The mixture is then subjected to heat while being stirred and at various times samples are drawn off for the purpose of testing. The mixture is heated for approximately 1½ hours at a temperature of 80° C. when formic acid is added, which results in a coagulation of the substance and the formation of a gathering into small lumps or a flocculate. When that stage has been reached, the reaction has stopped and the coagulant remains over night. In the morning it is rinsed several times with water, washed, and then pressed for the purpose of removing all of the water. It is then placed in a hammer mill where it is broken up into a crumb or granule size, after which it is dried and put into bags for shipment.

It is an established physical fact, as shown in the record, that field latex as it comes from its source contains not only small particles of rubber but also nonrubber ingredients, among which are lipoids, which are fatlike substances containing protein, sugars, and salts. It appears that the constituents of the latex which are not rubber cause the latex and the rubber particles contained therein to deteriorate. Therefore, it is necessary that such foreign matters be removed or neutralized within less than a day after the latex is obtained from the trees.

It appears that in the fresh field latex the rubber particles measure from 0.2 to 5 microns while the rubber particles in the imported merchandise are from 20 to 500 microns in measurement. It is clear, therefore, that the process employed in the production of the involved merchandise results in bringing together or conglomerating

the smaller original particles of rubber to form those of greater size and the other effect is to coagulate the proteins in the latex to form a protective skin or kind of rind about the larger rubber particles. Each of these particles, after being formed, is held loosely to others by reason of pressure used in the extraction of the water and the passing of the matter into the hammer mill merely serves to separate the particles.

It appears that the chief use of mealorub is as an admixture with asphalt and gravel in the surfacing of roads. It also may be used in the making of compounds which are poured into the joints between concrete slabs to prevent moisture damage and, also, when mixed with asphalt, it may be used in roofing compounds. Other uses appear in the record which are entirely experimental.

The trial court rejected the claim of appellant that the goods in issue are properly free of duty as crude rubber or dutiable as a non-enumerated unmanufactured article and held the proper dutiable status to be as articles manufactured in whole or in part, not specially provided for.

In his Assignment of Errors, counsel for appellant alleges that the judgment of the court was improper for the reason that the imported merchandise was not held to be dutiable as India rubber crude. Therefore, the issue is principally one of fact and is to be resolved upon the determination as to whether or not the mealorub is manufactured or crude.

It is the contention of counsel for appellant that mealorub must be considered to be crude rubber for the reason that the processing of field latex is substantially the same as that employed in the production of commercially known forms of crude rubber, such as crepe rubber, smoked sheets, and concentrated latex and that the purpose of producing such types of rubber by means of the same process as hereinbefore set out obtains the rubber concentrates of the tree latex in such form that they are suitable for use in the manufacturing of crepe rubber, smoked sheets, and concentrated latex.

Counsel for the Government, while it agrees with the argument that the purpose of producing concentrated latex crepe rubber and smoked sheets is to make the rubber constituents of tree latex suitable for use in the manufacturing of rubber articles, does not agree that such is the purpose in the production of mealorub. Neither does counsel agree that the method of production is substantially the same. He notes in his brief that the record herein clearly establishes that mealorub has been vulcanized or, in the words of appellant's witnesses "initially vulcanized."

With respect to that phase of the issue, the lower court pointed out that in the production of mealorub chemical and physical factors are employed, noting sulfur, an accelerator, and heat, the effect of which

are to initially or partially vulcanize the product. The court further noted that the evidence tendered by the Government shows the involved substance does not respond to certain tests for crude rubber and would appear to indicate that it has characteristics which lie somewhere between those of crude rubber and vulcanized rubber. The trial court then went on to state:

> The record does not establish that the chemical and physical factors referred to hereinbefore were necessary for the purpose of isolating the rubber constituents of the latex and to put them in condition for transportation, storage, and use as a crude rubber material. On the contrary, it is a reasonable inference from the evidence offered that they were responsible for certain of the characteristics of vulcanized rubber which appear in the imported product.

We consider the reasoning of the trial court very logical, particularly in view of the fact that testimony on behalf of the appellant, was to the effect that the purpose of the partial vulcanization was to remove coherency between the rubber particles.

Witnesses for both appellant and the Government agreed with the definition of "vulcanization" appearing in Webster's New International Dictionary, 2nd ed., 1943, reading as follows:

> Vulcanization. 1. Act or process of treating crude rubber, rubber latex, gutta-percha, et cetera, by chemical means, to improve its useful physical properties, as its strength, hardness, elasticity, et cetera. This improvement is brought about by combination (probably chemical) with some element or compound, especially sulfur or a compound of sulfur. There are two processes: hot vulcanization, the more important one, discovered by Goodyear in 1839 (Goodyear process) in which the rubber is heated with sulfur or less often with sulphides, sometimes in steam (open or steam cure), sometimes in dry air (dry-air cure); and cold vulcanization (cold cure) discovered by Alexander Parkes, an Englishman, in which rubber is treated at ordinary temperature with a solution or vapors of a sulfur compound, especially sulfur monochloride. Certain substances materially shorten the time of vulcanization.

It appears that the total sulfur content in the imported goods is 1.86 per cent and it also appears that ordinary rubber bands, concededly made of vulcanized rubber, possess a sulfur content as low as 1 per cent or less.

We are definitely of the opinion that on the instant record mealorub is not in the form of crude rubber. We do not deem it necessary to comment upon whether or not the imported goods are either manufactured or unmanufactured articles. The appellee did not appeal from the judgment of the trial court and, therefore, may not obtain a more favorable judgment here. Unquestionably, it is obvious that mealorub is the result of a manufacturing process.

For the reasons hereinbefore set out, the judgment of the United States Customs Court is *affirmed.*

WILLIAM P. COLE, JR., Judge, having participated below, disqualified himself to sit in this case and Jackson, Judge, retired, was recalled to participate herein.